# United States Court of Appeals for the Federal Circuit

2008-7120

RICHARD GAMBILL,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.

Michael A. Morin, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for claimant-appellant. Mark A. Lippman, The Veterans Law Group, of LaJolla, California, for claimant-appellant.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent-appellee. On the brief were Jeanne E. Davidson, Director, Todd M. Hughes, Deputy Director, and Elizabeth A. Holt, Trial Attorney. Of counsel on the brief were David J. Barrans, Deputy Assistant General Counsel, and Martie S. Adelman, Attorney, Office of the General Counsel, United States Department of Veterans Affairs, of Washington, DC.

Appealed from: United States Court of Appeals for Veterans Claims

Judge William A. Moorman

# United States Court of Appeals for the Federal Circuit

2008-7120

RICHARD GAMBILL,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.

Appeal from the United States Court of Appeals for Veterans Claims
in 06-1943, Judge William A. Moorman.

_____

DECIDED:  August 13, 2009

_____

Before BRYSON, LINN, and MOORE, <u>Circuit Judges</u>.

Opinion for the court filed <u>PER CURIAM</u>.  Concurring opinions filed by <u>Circuit Judge</u> BRYSON and <u>Circuit Judge</u> MOORE.

PER CURIAM.

Richard Gambill served in the United States Army between 1969 and 1971. During his service, a trash barrel fell on his head, resulting in a one to two centimeter laceration on his scalp and an abrasion on his forehead.  When he left the service, his separation examination was normal.  In 1994 and 1995, Mr. Gambill was treated for bilateral cataracts.  At that time, his physician told him it is possible for a blow to the head to cause cataracts.  Thereafter, Mr. Gambill filed a claim for disability benefits with

a regional office of the Department of Veterans Affairs ("DVA"). In his claim, he asserted that his cataracts were service-connected because they were caused by the blow to his head that he suffered during military service. Following a DVA consultation examination, the regional office denied his claim. Mr. Gambill then appealed to the Board of Veterans' Appeals. He waived his right to a hearing before the Board.

By regulation, the Board is authorized to request a medical opinion from a health care professional in the DVA's Veterans Health Administration ("VHA") whenever, in the Board's judgment, "medical expertise is needed for equitable disposition of an appeal." 38 C.F.R. § 20.901. The Board is also authorized to obtain a medical opinion from an independent medical expert if "expert medical opinion, in addition to that available within the Department, is warranted by the medical complexity or controversy involved in an appeal case." 38 U.S.C. § 7109(a).

In Mr. Gambill's case, the Board concluded that the examiner who conducted the consultation examination "did not adequately address the etiology of [Mr. Gambill's] bilateral cataracts including whether [his] bilateral cataracts were caused by an inservice blow to the head." The Board therefore requested an additional opinion from a VHA ophthalmologist "as to whether the veteran's bilateral cataracts and residuals thereof are as likely as not the result of an inservice head injury." The ophthalmologist did not examine Mr. Gambill, but provided a report containing a medical opinion. The report summarized Mr. Gambill's medical history, listed the risk factors for the development of cataracts, and then stated, "In a search of the literature, I could find no reports suggesting head trauma was a cause or an associated risk factor in the development of cataracts." The ophthalmologist added that "certainly direct eye trauma

is an associated risk factor for cataract development [but] the patient denies ocular trauma."

Pursuant to regulation, the Board provided Mr. Gambill with a copy of the ophthalmologist's opinion and advised him that he had 60 days "to review the medical opinion and send us any additional evidence or argument you may wish to make." Mr. Gambill availed himself of that opportunity by submitting a statement in support of his contention that the blow to his head during service had caused his cataracts. Mr. Gambill provided excerpts from several articles found on the Internet. One stated that "cataract formation after non-perforating injuries such as contusion or concussion may occur without any damage to the lens capsule." A second identified "trauma (e.g., head injury or puncture wound)" as among the causes of cataracts. In addition, Mr. Gambill submitted a letter from his physician stating that "[i]t is possible that a blow to the head can contribute to the development of cataracts and retinal detachments." Mr. Gambill waived his right to have his case remanded to the regional office for review of the evidence he had submitted and instead asked that the Board proceed with the adjudication of his appeal.

After reviewing all the evidence before it, the Board denied service connection for Mr. Gambill's cataracts. The Board recognized that Mr. Gambill had submitted evidence, including statements from two physicians, that head trauma could cause cataracts, but it determined that nothing in the record suggested that Mr. Gambill's cataracts were caused by his head injury. With respect to the physicians' letters, the Board noted that the physicians "did not specifically state that the veteran's cataracts developed because of his inservice head injury," and that to the extent the letters were

offered to establish that Mr. Gambill developed cataracts as a result of his in-service head injury, "they are insufficient in that the doctors did not specifically address the circumstances in this case."

The Board reached the same conclusion with respect to the materials from the Internet that Mr. Gambill submitted in support of the proposition that head trauma can cause cataracts, noting that those materials "were not prepared with consideration of the circumstances of this case." The Board therefore ruled that "[i]t would be speculative to find that the veteran's cataracts in this case, first noted in the 1990s, were the result of an inservice head injury, based on the simple fact that head injuries can possibl[y] cause cataracts." Even if the VHA ophthalmologist was in error as to whether head trauma can cause cataracts, the Board explained, "[t]here simply is no evidence of record, to include the medical treatise excerpts or [Mr. Gambill's] private physicians' statements . . . which actually makes this nexus connection. . . . The objective evidence of record does not show a relationship between the veteran's cataracts and his inservice head injury, and it does not provide for a favorable result in this case." The Board added that the lack of evidence linking Mr. Gambill's cataracts to his in-service head injury was "particularly dispositive as the first medical evidence of record of cataracts was not until many years after service separation."

Mr. Gambill appealed to the Court of Appeals for Veterans Claims ("the Veterans Court"). In his brief to that court, he asserted that the DVA had violated his rights under the Due Process Clause of the Fifth Amendment to the Constitution by not allowing him to submit written interrogatories to the VHA ophthalmologist and by failing to advise him that he had the right to do so.

The Veterans Court affirmed. It rejected Mr. Gambill's due process claim on the ground that an applicant for DVA disability benefits does not have a sufficient property interest in the prospect of receiving benefits to trigger the procedural protections of the Due Process Clause. Instead, the court ruled that "creating a procedural right in the name of fair process principles [for applicants for DVA disability benefits] is primarily based on the underlying concept of the VA adjudicatory scheme, not the U.S. Constitution." Gambill v. Peake, No. 06-1943, 2008 WL 1883915, at *2 (Ct. Vet. App. Apr. 28, 2008), quoting Prickett v. Nicholson, 20 Vet. App. 370, 382 (2006). With respect to the Board's authority to conduct its own evidentiary development by requesting a medical opinion, the court stated that the Board "must ensure that it provides the appellant fair process in the adjudication of his claim," and that "in rendering a decision on a claim, on any evidence developed or obtained by it, [the Board] must provide a claimant with reasonable notice of such evidence and of the reliance proposed to be placed on it, and a reasonable opportunity for the claimant to respond to it," including the right to submit additional evidence. Id., quoting from Thurber v. Brown, 5 Vet. App. 119, 126 (1993). In this case, the court held, the Board gave Mr. Gambill notice of the VHA ophthalmologist's opinion and an opportunity to submit additional evidence in response, which satisfied the requirements of fairness in the adjudication of his claim. Mr. Gambill then appealed to this court.

I

Mr. Gambill argues that the Due Process Clause of the Fifth Amendment requires that all veterans who apply for disability benefits must be afforded the

opportunity to confront adverse medical evidence, at least through the use of interrogatories. In addition, he contends, they must be given notice of that right.

Although the Supreme Court has declined to address the question whether due process protections apply to the proceedings in which the DVA decides whether veteran-applicants are eligible for disability benefits, see Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 312, 320 n.8 (1985), we have recently held that the Due Process Clause applies to such proceedings. See Cushman v. Shinseki, No. 2008-7129 (Fed. Cir. Aug. 12, 2009). Accordingly, we turn to the question whether Mr. Gambill's due process rights were violated by the failure to provide him with the right to serve interrogatories on the VHA ophthalmologist and to notify him that he had that right.

II

By regulation, the Board of Veterans' Appeals provides a claimant with notice that a VHA opinion has been requested and provides a copy of the opinion when it is received by the Board. 38 C.F.R. § 20.903(a); see also 38 U.S.C. § 7109(c) (when the DVA obtains an opinion from an independent medical expert, the Board similarly notifies the claimant of the request for an expert opinion and provides a copy of the expert's report as soon as it is received). The claimant then has 60 days to respond to the medical opinion by submitting any relevant evidence or argument that may assist the Board in reaching an equitable result. 38 C.F.R. § 20.903(a).

Mr. Gambill argues that the Due Process Clause is not satisfied by giving the veteran the opportunity to respond to an opinion from a VHA medical professional or an independent medical examiner, but that the veteran must be given an opportunity to

confront any physician who submits a medical opinion that the veteran regards as contrary to his interests in whole or in part. The submission of interrogatories, he contends, is the minimum necessary to satisfy his due process right to confront the evidence against him.

We need not address the broad questions whether the absence of confrontation rights in veterans' benefits cases renders such proceedings fundamentally unfair in general, or whether it could render the proceedings unfair in a particular case, because it is clear that the absence of a right to confrontation was not prejudicial in this case.[1] Even assuming that claimants in veterans' disability compensation proceedings have a constitutional right to challenge adverse evidence through interrogatories, the denial of that right in a particular case is subject to harmless error analysis. The Supreme Court has held that even in criminal cases, in which the right of confrontation is expressly guaranteed by the Sixth Amendment, a violation of that right can be harmless error. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); see also Neder v. United States, 527 U.S. 1, 18 (1999); Coy v. Iowa, 487 U.S. 1012, 1021-22 (1988). Harmless error is fully applicable to veterans' claims cases, subject to the same principles that apply generally to harmless error analysis in other civil and administrative cases. See Shinseki v. Sanders, 129 S. Ct. 1696, 1704 (2009) (citing the harmless error provision of title 38 that applies to proceedings before the Court of Appeals for Veterans Claims, 38 U.S.C. § 7261(b)(2), and the parallel harmless error provision of the Administrative

---

[1]    Because Mr. Gambill has argued that due process required not only that he be allowed to serve interrogatories on medical experts, but also that he be advised of that right, we do not rest our decision on his failure to request that he be allowed to serve interrogatories on the VHA ophthalmologist.

Procedure Act, 5 U.S.C. § 706, that applies generally to administrative proceedings). In such cases, the party "who seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." Palmer v. Hoffman, 318 U.S. 109, 116 (1943); see also Sanders, 129 S. Ct. at 1706 ("the party seeking reversal normally must explain why the erroneous ruling caused harm").

As the Board of Veterans' Appeals found, the evidence that Mr. Gambill presented in support of his claim was clearly insufficient to establish service connection for his cataracts because it failed to show a causal nexus between his in-service head injury and his cataracts. The evidence that Mr. Gambill presented to the regional office and the Board consisted of the following: (1) he suffered a head injury during service; (2) he developed cataracts more than 20 years later; and (3) his treating physician stated that "[i]t is possible that a blow to the head can cause cataracts."[2] That evidence showed only that it is possible that cataracts can be caused by head trauma; it did not show that Mr. Gambill's cataracts were caused by the injury he suffered in service.

Because the DVA consultation examination did not support Mr. Gambill's claim that his cataracts were caused by his in-service head injury, the Board requested an opinion from the VHA ophthalmologist and specifically asked that she address whether Mr. Gambill's cataracts were as likely as not the result of his in-service injury. As it turned out, the VHA ophthalmologist's report did not help Mr. Gambill. But it left him no worse off than he was without the report, as the rest of the evidence before the Board failed to prove actual causation.

---

[2] He subsequently supplemented that evidence, but his additional evidence was of the same character, all of it directed to the general proposition that it is possible for head trauma to cause cataracts.

The only portion of the ophthalmologist's report that Mr. Gambill has disputed is the statement that in her search of the literature she was unable to find any reports suggesting that head trauma was a cause or an associated risk factor in the development of cataracts. The rest of the report consisted of a factual recitation of Mr. Gambill's medical history, which appears not to be the subject of dispute, and a listing of associated risk factors for the development of cataracts which, except for the absence of any express reference to head injuries other than direct trauma to the eye, also appears to be undisputed.

Mr. Gambill argues that allowing confrontation through the submission of interrogatories would have helped elicit "the scientific methodology employed by the physician" and "the data upon which [she] based her medical opinion." But even if he had succeeded in completely undermining the ophthalmologist's opinion and had obtained her agreement that the medical literature showed that head trauma is a possible cause of cataracts, that evidence would still not show that Mr. Gambill's in-service blow to the head caused cataracts in his case. The problem of establishing actual causation in this case would remain Mr. Gambill's stumbling block; nothing he could realistically expect to obtain by way of confrontation of the VHA ophthalmologist, who did not examine him, would overcome that problem.

The absence of any prejudice to Mr. Gambill from the VHA ophthalmologist's report is apparent from the manner in which the Board analyzed Mr. Gambill's case. In particular, the Board found it unnecessary to resolve the apparent conflict between the VHA ophthalmologist's statement about her search of the medical literature and the materials submitted by Mr. Gambill about head trauma being a possible cause of

cataracts. As the Board stated, even if the VHA ophthalmologist was in error as to whether head trauma could cause cataracts, there was "simply no evidence of record, to include the medical treatise excerpts or the private physicians' statements," that established an actual causal nexus between Mr. Gambill's in-service injury and his cataracts. The Board's analysis thus confirms that the absence of confrontation of the VHA ophthalmologist did not prejudice Mr. Gambill's claim.

Because we conclude that the absence of confrontation had no prejudicial effect in this case, it is not necessary to address Mr. Gambill's further claim that the Board is obligated not only to provide claimants with the right to serve interrogatories on VHA physicians and independent medical experts, but also to advise the claimants of their right to do so. Thus, we do not reach the question whether Mr. Gambill's failure to request the right to serve interrogatories on the VHA ophthalmologist resulted in a waiver of whatever rights to confront witnesses in the administrative process that he might have as a matter of due process.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED</u>.

# United States Court of Appeals for the Federal Circuit

2008-7120

RICHARD GAMBILL,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.

Appeal from the United States Court of Appeals for Veterans Claims
in 06-1943, Judge William A. Moorman.

BRYSON, Circuit Judge, concurring:

I agree with the court that even if a claimant has a due process right to confront any VHA physician or independent medical examiner who provides a medical opinion upon request, the failure to provide for confrontation in this case was not prejudicial to Mr. Gambill. More fundamentally, however, I believe that within the veterans' disability compensation system due process does not require that claimants be given the right to confront physicians who provide such opinions.

A

Almost a quarter century ago, the Supreme Court analyzed the application of the Due Process Clause to the veterans' benefits system in its seminal decision in Walters v. National Association of Radiation Survivors, 473 U.S. 305 (1985). In that case, the Court addressed the constitutionality of a statute that sharply restricted the maximum

fee that may be paid to an attorney representing a veteran before the DVA in a claim for benefits for service-connected death or disability. Although recognizing that the practical effect of the statute was to deny legal representation to veterans in most DVA compensation proceedings, the Court upheld the statute against a due process challenge. In so doing, the Court analyzed the veterans' benefits system in detail and concluded that, in light of the informal and pro-claimant nature of that system, the Due Process Clause does not require the same kinds of procedures that would be required in a more conventional adversarial proceeding. The Court's analysis in Walters is highly pertinent to the issue before us and virtually dictates the proper disposition of the constitutional claim raised in this case.

The Walters Court began its analysis by emphasizing that due process "is a flexible concept—that the processes required by the [Due Process] Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur." 473 U.S. at 320. Importantly, the Court emphasized that the Due Process Clause does not require procedures that guarantee against an erroneous deprivation, and that "the marginal gains from affording an additional procedural safeguard often may be outweighed by the societal cost of providing such a safeguard." Id. at 320-21. Moreover, the Court stated that a particular process is not constitutionally infirm simply because another process would have been useful in a particular case; instead, the Court explained, "a process must be judged by the generality of cases to which it applies, and therefore, process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them." Id. at 330.

More generally, the Supreme Court has characterized the critical components of due process as notice and the opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976), quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965). While it is clear that due process requires "some kind of hearing" when a property interest is at stake, Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570 (1972), the form of the hearing can vary. Due process thus "calls for such procedural protections as the particular situation demands. . . . [N]ot all situations calling for procedural safeguards call for the same kind of procedure." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). In particular, due process does not require a trial-type hearing in every case. Cafeteria Workers v. McElroy, 367 U.S. 886, 894-95 (1961).

The Court has set forth three factors that warrant consideration in determining what specific procedures must be provided in particular cases: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335.

The Supreme Court in Walters addressed each of those factors as they pertain to veterans' benefits determinations. As to the private interest that will be affected by the official decision, the Walters Court held that disability and survivorship benefits, which are not granted on the basis of need, "are more akin to the Social Security benefits involved in Mathews than they are to the welfare payments upon which the recipients in

Goldberg [v. Kelly, 397 U.S. 254 (1970),] depended for their daily subsistence." 473 U.S. at 333. Although the private interest in disability benefits is still substantial, the Walters Court identified the difference in the individual's interest in disability benefits and in welfare benefits as justifying the less formal procedures employed in veterans' benefits cases than in cases involving the termination of welfare benefits. Id.

The Walters Court made clear that the other two Mathews factors likewise justified the use of informal procedures in the veterans' benefits system. After analyzing the operation of that system, the Court concluded that "great weight must be accorded to the Government interest at stake here." 473 U.S. at 326. The Court explained:

> The flexibility of our approach in due process cases is intended in part to allow room for other forms of dispute resolution; with respect to the individual interests at stake here, legislatures are to be allowed considerable leeway to formulate such processes without being forced to conform to a rigid constitutional code of procedural necessities.

Id. "It would take an extraordinarily strong showing of probability of error under the present system," the Court added, to warrant a holding that the statute barring compensation of counsel in veterans' benefits cases denied the claimants' rights to due process. Id.

In light of the Court's analysis in Walters, the procedures employed by the DVA to obtain and use medical experts' opinions in veterans' disability benefits cases do not, in my judgment, violate due process. Given Congress's desire that the proceedings in veterans' benefits cases be "as informal and nonadversarial as possible" in veterans' benefits cases, Walters, 473 U.S. at 323-24, the procedures available to claimants to obtain and challenge expert medical opinions provide notice and an opportunity to be heard in a meaningful manner and thus satisfy due process standards. I set forth below

the reasons why that is so, again drawing heavily on the Supreme Court's due process analysis in <u>Walters</u>.

B

<u>Walters</u> makes clear that the informal and uniquely pro-claimant nature of the veterans' disability compensation system is of critical importance in assessing the constitutionality of the procedures that are employed by the DVA. The Court surveyed the DVA's procedures in some detail, and those procedures are, if anything, even more protective of claimants now than they were at the time of <u>Walters</u>. In essence, the procedures are as follows:

Any veteran or veteran's representative can bring a claim for service-connected disability to a regional office of the DVA. No statute of limitations bars the filing of an application for benefits, and the denial of an application has no formal <u>res judicata</u> effect. <u>Walters</u>, 473 U.S. at 311. The DVA is required to notify the claimant and the claimant's representative of any information and any medical or lay evidence that is needed to substantiate the claim; as part of that notice, the DVA must indicate which portion of that information and evidence is to be provided by the claimant and which portion the DVA will attempt to obtain on behalf of the claimant. 38 U.S.C. § 5103A. The claimant has a right to a hearing before the regional office and can appear, either alone or with a representative; the hearing, moreover, is ex parte, as there is no representative of the government opposing the claim. 38 C.F.R. § 3.103(a).

At the hearing before the regional office, the claimant is entitled to produce witnesses. 38 C.F.R. § 3.103(c)(2). To assure "clarity and completeness of the hearing record, questions which are directed to the claimant and to witnesses are to be framed

to explore fully the basis for claimed entitlement rather than with an intent to refute evidence or to discredit testimony." Id. Any evidence offered by the claimant and any contention or argument a claimant may offer is to be included in the record. Id. § 3.103(d). By statute and regulation, it is the obligation of the DVA to assist the claimant in developing the facts pertinent to the claim. 38 U.S.C. § 5103A; 38 C.F.R. § 3.103(a), (c). And the regional office is required to construe all applications liberally in favor of the veteran. See 38 C.F.R. § 3.155(a); see also Moody v. Principi, 360 F.3d 1306, 1310 (Fed. Cir. 2004). Finally, unlike in many other settings, the claimant is not required to prove the claim by a preponderance of the evidence; instead, the DVA is instructed to give the benefit of the doubt to the claimant when "there is an approximate balance of positive and negative evidence regarding any issue material to the determination of the matter." 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102.

Any decision on the veteran's claim must be in writing; it must advise the claimant of the reasons for the decision; it must include a summary of the evidence considered by the DVA; and it must provide an explanation of the procedure for obtaining review of the decision. 38 U.S.C. § 5104; 38 C.F.R. § 3.103(f). If the veteran disagrees with the decision, the regional office will consider whether to resolve the disagreement, such as by granting the benefit sought. If the regional office does not resolve the disagreement, it will prepare a Statement of the Case to assist the claimant in perfecting an appeal to the Board of Veterans' Appeals. 38 U.S.C. § 7105(d)(1); 38 C.F.R. § 3.103(f).

Like the regional office, the Board is required to construe all of the veteran's arguments "in a liberal manner." 38 C.F.R. § 20.202. A claimant has a right to a

hearing on appeal before the Board at which the appellant and witnesses may be present. Id. § 20.700. Like the hearing before the regional office, the hearing before the Board is "ex parte in nature and nonadversarial," with no government representative present to oppose the appeal. Id. § 20.700(c). At the hearing, the proceeding is not governed by the rules of evidence, and the parties are "permitted to ask questions, including follow-up questions of all witnesses but cross-examination will not be permitted." Id. If it appears during such a hearing that additional evidence would assist in the review of the questions at issue, the Board may direct that the record be left open so that the appellant may obtain the desired evidence. Id. § 20.709. In addition, if necessary evidence cannot be otherwise obtained, the Board may issue a subpoena at the appellant's request to obtain the presence of a witness residing within 100 miles of the place where the hearing is to be held. Id. § 20.711. And, as occurred in this case, the Board may obtain a medical opinion from a VHA physician or an independent medical examiner. Id. § 20.901; 38 U.S.C. § 7109(a).

The above description makes it abundantly clear that the veterans' disability compensation system differs dramatically from a conventional adversarial process. This court and the Supreme Court "have long recognized that the character of the veterans' benefits statutes is strongly and uniquely pro-claimant." Hodge v. West, 155 F.3d 1356, 1362 (Fed. Cir. 1998). The relationship between the veteran and the government is nonadversarial, Jaquay v. Principi, 304 F.3d 1276, 1282 (Fed. Cir. 2002) (en banc), and because of the paternalistic nature of DVA proceedings, the DVA is required "to fully and sympathetically develop the veteran's claim to its optimum before deciding it on the merits," Comer v. Peake, 552 F.3d 1362, 1368 (Fed. Cir. 2009); McGee v. Peake, 511

F.3d 1352, 1357 (Fed. Cir. 2008). The process is "designed to function throughout with a high degree of informality and solicitude for the claimant." Walters, 473 U.S. at 311. Then-Chief Judge Mayer put the point succinctly when he stated, "Viewed in its entirety, the veterans' system is constructed as the antithesis of an adversarial, formalistic dispute resolving apparatus." Forshey v. Principi, 284 F.3d 1335, 1360 (Fed. Cir. 2002) (en banc) (Mayer, C.J., dissenting).

C

As the Supreme Court observed in Walters, Congress is fully aware that the veterans' disability compensation system does not follow the conventional adversarial fact-finding model; rather, "Congress desired that the proceedings be as informal and nonadversarial as possible." 473 U.S. at 323-24. In the years since Walters was decided, Congress has adhered to that model. In fact, Congress made a point of preserving the nonadversarial, pro-claimant character of the DVA system when it added judicial review to the system in 1988. The House report on the 1988 legislation stated that point clearly:

> Congress has designed and fully intends to maintain a beneficial non-adversarial system of veterans benefits. This is particularly true of service-connected disability compensation where the element of cause and effect has been totally by-passed in favor of a simple temporal relationship between the incurrence of the disability and the period of active duty.
> I[m]plicit in such a beneficial system has been an evolution of a completely ex-parte system of adjudication in which Congress expects VA to fully and sympathetically develop the veteran's claim to its optimum before deciding it on the merits. Even then, VA is expected to resolve all issues by giving the claimant the benefit of any reasonable doubt. In such a beneficial structure there is no room for such adversarial concepts as cross examination, best evidence rule, hearsay evidence exclusion, or strict adherence to burden of proof.

. . . . .

2008-7120                                    8

> To the extent possible, the committee expects that the procedures employed at the regional office level will continue to be employed by VA, in order to assure that claims are handled in an expeditious manner that is sympathetic to the veteran's claim. The committee believes that the existing system achieves a high degree of accuracy and fairness and intends that no changes be made to the system unless it would enhance achievement of these two goals.

H.R. Rep. No. 100-963, at 13, 15 (1988), reprinted in 1988 U.S.C.C.A.N. 5782, 5795, 5797.  This court made the same point more recently in Hodge v. West, 155 F.3d at 1362:

> Congress itself has recognized and preserved the unique character and structure of the veterans' benefits system. For example, when it passed the Veterans' Judicial Review Act and Veterans' Benefits Improvement Act of 1988, and thus for the first time established judicial review for DVA disputes, Congress emphasized the historically non-adversarial system of awarding benefits to veterans and discussed its intent to maintain the system's unique character[.]

While proceedings are more adversarial when a veteran appeals to the Veterans Court, the process at the administrative stages within the DVA remains much as the Supreme Court described it in 1985:  "[T]he process prescribed by Congress for obtaining disability benefits does not contemplate the adversary mode of dispute resolution utilized by courts in this country."  Walters, 473 U.S. at 309; see also 38 C.F.R. § 20.700(c) ("Hearings conducted by the Board are ex parte in nature and nonadversarial.  Parties to the hearing will be permitted to ask questions, including follow-up questions, of all witnesses but cross-examination will not be permitted.").

Apart from demonstrating Congress's general desire to preserve the nonadversarial nature of the veterans' disability compensation system, the legislative history of the 1988 statute makes it clear that Congress specifically wished to avoid the introduction of adversarial procedures such as interrogatories.  Early versions of the

1988 Act contained provisions for serving written interrogatories on any person, including DVA employees. Those provisions were omitted from the statute as enacted, however. A joint statement by the Senate and House Committees regarding the bill that was ultimately enacted explained that written interrogatories, along with several other procedural provisions, had been omitted. The statement explained, "The Committees intend [that the Board's] informal procedures be continued." Explanatory Statement of the Compromise Agreement on S. 11, As Amended, the "Veterans' Judicial Review Act", 134 Cong. Rec. 31473, 31477 (1988), reprinted in 1988 U.S.C.C.A.N. 5834, 5843 ("Explanatory Statement"). The sponsor of the legislation in the Senate underscored that point, explaining that Congress's intent was "that the BVA continue to operate in its informal, nonadversarial manner." 134 Cong. Rec. 31468 (1988) (remarks of Sen. Cranston).

D

Like the procedure used in the veterans' disability compensation system generally, the procedure that the DVA has provided for a claimant to obtain, rely on, and respond to an expert medical opinion is nonadversarial. The DVA's regulations provide that a claimant or the claimant's representative may request a medical opinion from a VHA physician or an independent medical expert, which "will be granted upon a showing of good cause, such as the identification of a complex or controversial medical . . . issue involved in the appeal." 38 C.F.R. § 20.902. The Board's authority to obtain a medical opinion from a VHA physician on its own initiative is part of the DVA's duty to assist a claimant to obtain evidence to substantiate a claim. See 38 C.F.R. § 3.159(c)(4). The Board may request a medical opinion from a VHA physician "on

medical questions involved in the consideration of an appeal" when, in the Board's judgment, "such medical expertise is needed for equitable disposition of an appeal." Id. § 20.901. The Board has parallel statutory authority to obtain a medical opinion from an independent medical expert if "expert medical opinion, in addition to that available within the Department, is warranted by the medical complexity or controversy" involved in the appeal. 38 U.S.C. § 7109(a); 38 C.F.R. § 20.901(d).

When the Board requests such an opinion, the Board must provide the claimant with notice that a VHA physician's opinion has been requested and must provide a copy of the opinion to the claimant when it is received by the Board. 38 C.F.R. § 20.903(a); see also 38 U.S.C. § 7109(c) (when the VA obtains an opinion from an independent medical expert, the Board similarly notifies the claimant of the request for an expert opinion and provides a copy of the expert's report as soon as it is received). The claimant then has 60 days to respond to the medical opinion by submitting any relevant evidence or argument that may assist the Board in reaching an equitable result. 38 C.F.R. § 20.903(a).

Mr. Gambill contends that when the Board requests an expert medical opinion, due process requires the DVA to afford a veteran not just an opportunity to respond to the opinion, but also an opportunity to confront the physician who submitted it. While he does not argue that he is constitutionally entitled to in-person cross-examination of the physician, he argues that he is at least entitled to use interrogatories directed to the physician as a way to confront the evidence against him. Interrogatories must be permitted, according to Mr. Gambill, because (1) they are essential to the fairness of the proceedings in that they are substantially more effective than the submission of contrary

evidence alone, and (2) they are less burdensome for physicians than in-person cross-examination.

1

Mr. Gambill has offered no convincing reason to believe that if a claimant is not allowed to confront medical experts' opinions, the results of Board appeals will be so unreliable as to be constitutionally invalid. While in some cases confrontation of the physician who has given a medical opinion may be productive, the nature of expert medical opinions is such that in many cases the most effective way of countering a questionable opinion will be to offer a contrary opinion with more support in the medical literature or from other medical experts.

This case provides a good illustration of why that is so. Mr. Gambill's quarrel with the VHA ophthalmologist's report focuses on the ophthalmologist's statement that she was unable to find any support in the literature for the proposition that head trauma is a cause or an associated risk factor in the development of cataracts. To the extent that Mr. Gambill wished to challenge her statement about the medical literature, the best way to proceed would seem to be to introduce contrary medical opinions and literature on the point in dispute. After all, what is important in such a case is not whether the physician is an expert on the particular topic at issue or how much effort she put into her search of the literature; what matters is what experts in the field believe and what a thorough search of the literature would reveal. That information could effectively be developed through the introduction of contrary opinions from experts and from the medical literature. Indeed, Mr. Gambill sought to use that approach in this case. The evidence he offered was ineffective, not because of the general ineffectiveness of

contrary evidence as a means of challenging a medical professional's opinion, but because it did not establish causation on the facts of this case.

Mr. Gambill's attorney asserts that the ability to confront an expert witness who gives a medical opinion is preferable to being limited to introducing contrary evidence. Of course, a lawyer representing a party in a trial-type setting will always prefer to have as many tools for challenging adverse evidence as possible. But as Justice Brennan wrote for the Supreme Court some years ago, "[I]t should not routinely be assumed that any decision made without the forms of adversary factfinding familiar to the legal profession is necessarily arbitrary or incorrect." Smith v. Org'n of Foster Families for Equality & Reform, 431 U.S. 816, 851 n.58 (1977). The pertinent question is not whether, in a particular case, a skilled advocate could make effective use of tools of confrontation such as interrogatories or cross-examination. Rather, the question is whether the absence of such tools would be likely to have such a distortive effect on the truth-seeking process and produce such unreliable results as to render the proceeding fundamentally unfair. At least with respect to expert medical opinions obtained by the Board to assist it in assessing individual claims, I am satisfied that the regulatory prohibition on confronting medical experts, either by in-person cross-examination or through interrogatories, does not create an unacceptable risk of unreliable outcomes.

That is especially true in light of the entire complex of protections afforded to claimants in the disability compensation process, including the DVA's duty to assist the claimants in presenting their claims, its duty to construe the claimant's presentation liberally, the rule that the claimant will be given the benefit of the doubt in close cases, and the ex parte nature of the proceedings, in which the government is not represented

by an attorney or other representative whose role is to oppose the claim. While Mr. Gambill has characterized the absence of confrontation rights in the veterans' disability compensation system as indicative that the system provides for _less_ process than in more formal settings, a more accurate description would be that it offers _different_ process. To reiterate the point made by the Supreme Court in Walters, the flexibility of due process "is intended in part to allow room for other forms of dispute resolution," and to allow "considerable leeway" in formulating such processes "without being forced to conform to a rigid constitutional code of procedural necessities." 473 U.S. at 326.

Finally, with respect to the risk of inaccurate results, there has been no showing in this case—or elsewhere so far as we are advised—that the nonadversarial veterans' disability benefits system, with its many pro-claimant features, produces more erroneous decisions against claimants than would be produced in an adversarial system in which confrontation of witnesses was permitted, but in which the various procedural advantages that are afforded to veteran-claimants were absent. Even though in the Walters case the plaintiffs had introduced evidence that the participation of lawyers resulted in some marginal benefit to claimants, the Supreme Court found that showing to be insufficient. The showing made in that case, the Court observed, did not constitute the "extraordinarily strong of probability of error" that would be required to warrant constitutional condemnation of the current system. 473 U.S. at 326. A fortiori, the showing in this case, which is essentially limited to the unspoken (but hardly unassailable) proposition that more elaborate process is likely to produce more accurate results, is insufficient to invalidate the system devised by the agency and blessed by Congress.

As to the issue of burdensomeness, it is no doubt true, as Mr. Gambill contends, that interrogatories are less intrusive than in-person cross-examination. Nonetheless, interrogatories would still be burdensome for the physicians who would be required to respond to them. In addition, apart from expenditure of time in framing appropriate responses to the interrogatories, the submission of interrogatories could well result in collateral conflicts over the content of the interrogatories and the adequacy of the responses.

A further problem with the position taken by Mr. Gambill in this case is that the scope of the confrontation right for which he argues is entirely undefined. Mr. Gambill suggests that the confrontation right he seeks would not include the right of in-person cross-examination, and that the right to submit interrogatories would be limited. He states that "a claimant should only be allowed to submit a reasonable number of questions, say, five or six on the outside." That proposal suggests that the Due Process Clause requires "five or six" interrogatories, but not twenty. The arbitrariness of that distinction is obvious.

Adopting Mr. Gambill's position would virtually ensure that the Board, the Veterans Court, and this Court would be collectively launched into an ongoing line-drawing exercise regarding the number and character of the interrogatories that would have to be allowed. Mr. Gambill may have conceded that only "five or six" interrogatories need be granted, but his concession would not bind the next claimant, who would want more, or the next, who would argue that the responses to the interrogatories were inadequate and follow-up interrogatories or in-person cross-

examination were required.  The overall burdensomeness of proceeding down that road is clear.

In short, the use of interrogatories would undermine, at least to some degree, the nonadversarial nature of the veterans' compensation system by forcing medical personnel into an adversarial posture with regard to the veteran claimants.  Mr. Gambill responds that interrogatories are "less adversarial than the subpoena procedure," but he does not dispute that their use would introduce some level of antagonistic interaction.  I cannot lightly disregard the interest in maintaining the nonadversarial nature of the system.  When that interest is balanced against the limited benefits of allowing interrogatories, I conclude that the availability of interrogatories is not constitutionally mandated.

E

In an often-cited 1975 article, Judge Henry Friendly surveyed the due process landscape and addressed a broad range of procedures that may not be necessary in particular cases where full trial-type proceedings are not required.  Henry J. Friendly, "Some Kind of Hearing", 123 U. Pa. L. Rev. 1267 (1975).  Among the fundamental elements of a fair hearing, he identified an unbiased tribunal, notice of the proposed action and the grounds for it, and the opportunity to present reasons why the proposed action should not be taken.  He identified the right to counsel and the right of confrontation as less fundamental to a fair proceeding.  Id. at 1279-91.

While acknowledging the importance of confrontation procedures in criminal cases and certain civil matters, Judge Friendly questioned the universal applicability of such procedures "to the thousands of hearings on welfare, social security benefits,

housing, prison discipline, education, and the like which are now held every month—not to speak of hearings on recondite scientific or economic subjects." Id. at 1284. In a passage that seemed to anticipate the Supreme Court's decision in Walters, Judge Friendly observed that the problems associated with providing rights of counsel and confrontation in such cases "inevitably bring up the question whether we would not do better to abandon the adversary system in certain areas of mass justice, notably in the many ramifications of the welfare system." Id. at 1289. In the system he proposed, a presiding official "would have the responsibility for developing all the pertinent facts and making a just decision." The presiding official would assume an active role in the hearing: "[F]or example, he would examine the parties, might call his own experts if needed, request that certain types of evidence be presented, and, if necessary, aid the parties in acquiring that evidence." Id. Judge Friendly added that the system he described, which he referred to as "investigatory,"

> should not be viewed as a lessening of the protection to the individual; if properly applied, it could well result in more. This investigatory model would also have the advantage of being more informal; the decisionmaker, in a conference-type setting, would hear the evidence and discuss the dispute with the parties and with their attorneys, assuming that they were permitted to have them. . . . There is no constitutional mandate requiring use of the adversary process in administrative hearings unless the Court chooses to construct one out of the vague contours of the due process clause.

Id. at 1290-91. Judge Friendly's model describes the veterans' disability benefits system with remarkable accuracy. His analysis, like the subsequent analysis of the Supreme Court in Walters, shows why the procedures that are routinely employed in criminal and civil litigation, including rights to counsel and confrontation, are not

constitutionally required components of an administrative benefits system, particularly one that is nonadversarial and pro-claimant in design and operation.

F

Another factor that supports the conclusion that due process does not require a right to serve interrogatories on medical experts has to do with the subject matter: medical judgments. On several occasions, the Supreme Court has addressed the question of how to apply due process in the context of medical decisions. The Court's opinions, particularly its opinion in Parham v. J.R., 442 U.S. 584 (1979), are instructive.

In Parham, the Court considered whether Georgia's procedure for the voluntary commitment of mentally ill children violated due process. The Court paid special attention to the fact that when a State is forced to determine whether a child is sufficiently mentally ill to permit a parent or guardian to institutionalize the child, the State faces questions that are "essentially medical in character." Id. at 609. The Court recognized that "[n]ot every determination by state officers can be made most effectively by use of 'the procedural tools of judicial or administrative decisionmaking.'" Id. at 608, quoting Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 90 (1978). In the context before it, the Court held that a formal or quasi-formal hearing was not required and that "due process is not violated by use of informal traditional medical investigative techniques." 442 U.S. at 607. In so concluding, the Court stated that "neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments." Id. Accordingly, the Court looked to the practical realities of how an "essentially medical" decision could be reached with a reduced rate of error. The Court explained:

The mode and procedure of medical diagnostic procedures is not the business of judges. What is best for a child is an individual medical decision that must be left to the judgment of physicians in each case. We do no more than emphasize that the decision should represent an independent judgment of what the child requires and that all sources of information that are traditionally relied on by physicians and behavioral specialists should be consulted.

Id. at 607-08. Rejecting the notion that an adversarial procedure is necessary, the Court stated that with respect to decisions to commit the mentally ill, "Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions . . . may well be more illusory than real." Id. at 609. The Court's decision that a nonadversarial system is appropriate in the medical context involved in Parham v. J.R. thus rested on the judgment that the risk of error in a procedure involving decisions made by independent medical decisionmakers would not be "significantly reduced by a more formal, judicial-type hearing." Id. at 613.

Parham illustrates the point that when medical decisions are in issue, the benefits that may otherwise be associated with the adversarial system are frequently attenuated. In other cases as well, the Court has approved the use of nonadversarial administrative proceedings that have been implemented to deal with medical determinations. See Washington v. Harper, 494 U.S. 210, 233 (1990) (decision whether to compel a prisoner to take anti-psychotic medicine does not require a judicial decisionmaker; because "the risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals," a State may permissibly choose administrative review using medical decisionmakers rather than a judicial hearing); Vitek v. Jones, 445 U.S. 480, 495 (1980) ("essentially medical" decision

whether to transfer a prisoner to a mental hospital for treatment does not require presence of counsel).

In the DVA's system for determining whether particular disabilities are service-connected, the decision frequently turns on a medical judgment. In light of the nature of the inquiry in DVA disability proceedings, the Supreme Court has determined that the agency's decision need not be made in a formal adversarial proceeding. As the Court stated, "It is less than crystal clear why lawyers must be available to identify possible errors in medical judgment." Walters, 473 U.S. at 330 (emphasis in original). For the same reasons, I do not regard confrontation, either through in-person cross-examination or interrogatories, to be an essential component of procedural fairness when the issue involves a request for a medical opinion from a VHA physician or an independent medical expert in the course of a veterans' disability compensation hearing before the Board of Veterans' Appeals.

G

As a final point, it is worth noting that Mr. Gambill relies heavily on cases from other courts of appeals dealing with due process challenges to the procedures employed in social security benefits cases. In several of those cases, the courts have held that due process requires that the claimants be allowed either the right of cross-examination or the right to serve interrogatories as a means of challenging post-hearing medical reports. See, e.g., Calvin v. Chater, 73 F.3d 87 (6th Cir. 1996); Demenech v. Sec'y of Dep't of Health & Human Servs., 913 F.2d 882 (11th Cir. 1990); Lidy v. Sullivan, 911 F.2d 1075 (5th Cir. 1990); Solis v. Schweiker, 719 F.2d 301 (9th Cir. 1983); Cowart v. Schweiker, 662 F.2d 731 (11th Cir. 1981). Those cases can be

factually distinguished from this one on the ground that each of them involved examination reports assessing the particular claimant's condition, not merely evidence as to a general medical principle, as in this case. With respect to the latter type of evidence, there is arguably less need for direct confrontation of the reporting physician.

More generally, while the veterans' disability compensation system is similar to the social security disability system in some respects, the two systems differ in an important regard: As the Supreme Court pointed out in Richardson v. Perales, 402 U.S. 389, 408-09 (1971), the statute that governs administrative proceedings in social security cases served as the model for section 7(c) of the Administrative Procedure Act, which provides that a party is entitled "to conduct such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d). See Wallace v. Bowen, 869 F.2d 187 (3d Cir. 1988) (reliance on post-hearing reports without opportunity for cross-examination denied claimant his statutory right to a decision based on evidence adduced at the hearing). By contrast, Congress made clear at the time of the Veterans' Judicial Review Act of 1988 that it did not want the provisions of section 7(c) of the Administrative Procedure Act to apply to veterans' disability compensation proceedings. The explanatory statement by the House and Senate Committees about that Act stated that the Committees intended that the Board's informal procedures "be continued and that the [Administrative Procedure Act] procedures relating to adjudications continue to be inapplicable." Explanatory Statement, 134 Cong. Rec. 31477 (1988), reprinted in 1988 U.S.C.C.A.N. at 5843. The adjudicative process in the social security system is thus intended to be more formal than in the veterans' disability compensation system, particularly with respect to the right of cross-examination.

Accordingly, without regard to whether those social security cases were correctly decided, they do not dictate the outcome in this case, which involves a different type of evidence and a different statutory scheme.

* * * * *

In sum, the Supreme Court's guidance in <u>Walters</u> and in the <u>Parham</u> line of cases leads me to conclude that due process does not require that veterans' disability compensation claimants must be permitted to use interrogatories or other forms of confrontation to challenge medical expert opinion evidence. I would therefore affirm the decision of the Veterans Court on that ground.

# United States Court of Appeals for the Federal Circuit

2008-7120

RICHARD GAMBILL,

Claimant-Appellant,

v.

ERIC K. SHINSEKI, Secretary of Veterans Affairs,

Respondent-Appellee.

Appeal from the United States Court of Appeals for Veterans Claims
in 06-1943, Judge William A. Moorman.

MOORE, <u>Circuit Judge</u>, concurring.

I agree with the court that Mr. Gambill suffered no prejudice here. I write separately to respond to Judge Bryson's concurrence. Unlike my colleague, I believe that due process requires that claimants of veterans' benefits be provided with the opportunity to confront the doctors whose opinions DVA relies upon to decide whether veterans are entitled to benefits. As my colleague points out, DVA's decision quite often turns on the content of these medical opinions. <u>See</u> Concurring Op. at 20. DVA must decide which opinion to believe, and of course its final weighing of the evidence is essentially unreviewable. Confrontation should be a central part of due process here because it is necessary to help DVA understand the limitations of the opinions before it, and may be the veteran's only route to undermine what could otherwise be unassailable evidence in favor of denying benefits.

Every circuit that has ruled on the issue has provided a similar confrontation right to claimants of social security disability benefits, either in the form of live testimony or written interrogatories. According to my colleague, veterans are not entitled to similar protections because the veterans' benefits system is non-adversarial and tipped in favor of the veteran. But the paternalistic attributes of the veterans' benefits system—many of which are shared by the social security system—militate toward providing more protection for veterans, not less. The availability of interrogatories to question the doctors who issue medical opinions adverse to the veteran are indisputably pro-claimant—they only stand to help the veteran explore and challenge an adverse medical opinion and ultimately prove their entitlement to claims. Although interrogatories may be "adversarial," they are only necessitated by a medical opinion which stands to block the veteran from obtaining disability benefits. I posit that because a veteran only needs interrogatories to challenge an opinion that contradicts his claims of entitlement, the process is already adversarial by virtue of the opinion. Hence, interrogatories only give the veteran a chance to explore an opinion that has already been rendered against him.

There is no evidence whatsoever that a limited confrontation right would ultimately do more harm than good for the veterans' benefits system. Lacking such a basis to restrict due process, and considering the crucial importance of these medical opinions, I do not agree that the government's interests outweigh the veteran's here. Interrogatories would serve mainly to help DVA get to the truth of the matter—whether the veteran is entitled to benefits.

The evidence at issue in this case is a two-page report written by a VHA ophthalmologist. The report is not typical of medical opinions relied upon by DVA

because it did not reach any conclusion regarding Mr. Gambill's condition. In fact, the VHA ophthalmologist rendered no opinions at all. After summarizing Mr. Gambill's medical history, she made a factual statement: "I could find no reports suggesting head trauma was a cause or an associated risk factor in the development of cataracts." Even if this statement had harmed Mr. Gambill's prospects for obtaining benefits, confrontation would not have been of great value to him. In this narrow and unusual circumstance, I agree with Judge Bryson that a far better response is to simply find and provide reports that suggest that head trauma can lead to cataracts, or better yet, a medical opinion that head trauma as likely as not caused Mr. Gambill's cataract condition. See Concurring Op. at 12. But I do not understand the concurrence to suggest that due process does not require the right of confrontation when the dispute is limited to factual statements asserting the absence of certain information in the medical literature. Rather, my colleague asserts that due process does not afford veterans the use of interrogatories or other forms of confrontation to challenge any medical expert opinion evidence. See id. at 1, 12-16, 22. It is here that I disagree. Mr. Gambill's case is not a "good illustration" of why confrontation does not further the veteran's interests. Id. at 12. Instead, Mr. Gambill's case represents an unusual exception to the common situation where the outcome of the claim for benefits turns on a physician's expert opinion relating to the veteran's medical history and condition. And in this more common situation, I believe that due process affords veterans a means to challenge the opinion.[1]

---

[1] The Supreme Court explained that "a process must be judged by the generality of cases to which it applies, and therefore a process which is sufficient for the

2008-7120                                  3

A.

The right to confront adverse witnesses is fundamental to American legal process.  As the Supreme Court explained:

> Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. . . . We have formalized these protections in the requirements of confrontation and cross-examination.  They have ancient roots.  They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him."  This Court has been zealous to protect these rights from erosion.  It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny.

Greene v. McElroy, 360 U.S. 474, 496-97 (1959) (citations and footnote omitted); see also Goldberg v. Kelly, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").  The Supreme Court recently reaffirmed the vitality of this principle with regard to affidavits reporting the results of forensic analysis.  Melendez-Diaz v. Mass., No. 07-591, 557 U.S. ____, 129 S. Ct. 2527 (2009).  Although the result in that case was commanded by the Sixth Amendment, id., slip op. at 12, the Court also observed that "neutral scientific testing" is not immune to fraud and incompetence, and that confrontation serves to test experts "honesty, proficiency, and methodology—the features that are commonly the focus in the cross-examination of experts," id., slip op. at 12-15.  Melendez-Diaz is a poignant and timely

---

large majority of a group of claims is by constitutional definition sufficient for all of them." Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 321 (1985).  The inverse applies here—a process insufficient for most is insufficient for all.

2008-7120                                          4

reminder of the central importance of confrontation no matter what form evidence may take. There is nothing special about the medical opinions relied upon by DVA that exempts them from this general rule. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 302 (2008) ("Both VA medical examiners and private physicians offering medical opinions in veterans benefits cases are nothing more or less than expert witnesses.").

In Richardson v. Perales, the Supreme Court applied these principles to social security disability claims, where just as here, "[t]he trier of fact has the duty to resolve [conflicting medical evidence]." 402 U.S. 389, 399 (1971). The Court held that the reports of medical experts were admissible evidence "subject as they are to being material and to the use of the subpoena and consequent cross-examination." Id. at 410. The Court explained that social security disability proceedings are informal, and noted that informality "is the obvious intent of Congress so long as the procedures are fundamentally fair." Id. at 401 (emphasis added).

Since Perales was decided, every circuit that has ruled on the issue has held that due process affords social security disability claimants either the right of cross-examination or the right to serve interrogatories as a means of challenging post-hearing medical reports. See Townley v. Heckler, 748 F.2d 109 (2d Cir. 1984); Wallace v. Bowen, 869 F.2d 187 (3d Cir. 1988); Lidy v. Sullivan, 911 F.2d 1075 (5th Cir. 1990); Flatford v. Chater, 93 F.3d 1296 (6th Cir. 1996); Lonzollo v. Weinberger, 534 F.2d 712 (7th Cir. 1976); Coffin v. Sullivan, 895 F.2d 1206 (8th Cir. 1990); Solis v. Schweiker, 719 F.2d 301 (9th Cir. 1983); Allison v. Heckler, 711 F.2d 145 (10th Cir. 1983); Demenech v. Sec'y of Dep't of Health & Human Servs., 913 F.2d 882 (11th Cir. 1990). Interestingly, the courts reached these decisions despite the decidedly informal and non-adversarial

nature of the social security disability system. See 20 C.F.R. § 404.900(b) ("In making a determination or decision in your case, we conduct the administrative review process in an informal, nonadversary manner."). I can think of no justification for suggesting that veterans, who have borne the battle, are entitled to less due process than social security disability applicants. See Hodge v. West, 155 F.3d 1356, 1363 (Fed. Cir. 1998) ("[I]n the context of veterans' benefits where the system of awarding compensation is so uniquely pro-claimant, the importance of systemic fairness and the appearance of fairness carries great weight."); Forshey v. Principi, 284 F.3d 1335, 1360 (Fed. Cir. 2002) (en banc) (Mayer, C.J., dissenting) (explaining that the informality and non-adversarial character of veterans benefits proceedings is "equal, if not greater" than that of social security disability proceedings).

Although most of the circuits require an absolute right to cross-examination, some of the circuits chose a similar path to what Mr. Gambill proposes—allowing the agency to retain its discretion to issue subpoenas, but imposing an absolute right to interrogatories. See, e.g., Flatford, 93 F.3d at 1306 ("[T]he practice of using interrogatories to question medical witnesses appears to work well for discerning an applicant's medical condition."). I agree with Mr. Gambill that this would be the wiser course in the veterans disability context. See id. ("Because of the nonadversary nature of social security adjudications, the need to cross-examine every reporting physician is less crucial to the fairness and accuracy of the administrative law judge's decision than it would be in an adversarial context."). Interrogatories will not make the veterans disability claims process adversarial, because by the time a veteran has the need to question a doctor, that doctor has already provided an opinion adverse to the veteran's

interests—the system has already become adversarial. Interrogatories are the fair response.

The government has not offered any evidence that interrogatories would impose a significant burden on DVA. Nor do I think that the Board, the Veterans Court, or our court would be overly burdened with cases asking us to define the scope of the confrontation right. <u>See</u> Concurring Op. at 15-16 ("Adopting Mr. Gambill's position would virtually ensure that the Board, the Veterans Court, and this Court would be collectively launched into an ongoing line-drawing exercise regarding the number and character of the interrogatories that would have to be allowed."). To the contrary, due process is a flexible concept, and DVA would have discretion over the particulars of the interrogatory process, subject to the Veterans Court's review for abuse of discretion. <u>See</u> 38 U.S.C. § 7261. The interrogatories could be proffered by the veteran or even conducted informally by DVA. Moreover, in the social security context where nearly every circuit guarantees at least the right to interrogatories, there has been no explosion of cases over the scope of the confrontation right, whether it be the manner in which live cross-examination is conducted, or the number and substance of interrogatories. The dearth of such disputes in the social security context leaves little room for claims that interrogatories would become an overly burdensome judicial headache.

My colleague asserts that the social security "cases can be factually distinguished from this one on the ground that each of them involved examination reports assessing the particular claimant's condition, not merely evidence as to a general medical principle, as in this case." Concurring Op. at 21. This reinforces the notion that the medical evidence offered is normally opinion evidence related to the

claimant, not general medical fact evidence. Moreover, even if the bulk of the social security cases were directed to instances where the medical opinion pertained to the claimant's condition, Judge Bryson's argument is not that interrogatories ought to be permitted when the medical opinion pertains to the claimant and denied when the medical opinion is one of general medical principle. His opinion, as I understand it, is that there is no right to interrogatories in any of these cases. This would result in us deciding that veterans are entitled to less protection than that which our sister circuits have held applicants for social security disability benefits are entitled to.

B.

The Supreme Court's decision in Walters v. National Association of Radiation Survivors, 473 U.S. 305 (1985), is not contrary to my view. See Concurring Op. at 2 ("Walters is highly pertinent to the issue before us and virtually dictates the proper disposition of the constitutional claim raised in this case."). First, since the time Walters was decided, the veterans system has changed in material ways that render much of the Walters analysis inapplicable. Second, whereas in Walters the Court relied on evidence of undue burden on the government, here there is no evidence of burden. Finally, unlike the situation in Walters, there are no acceptable alternative safeguards for the due process right at issue.

In Walters, the Supreme Court addressed the constitutionality of 38 U.S.C. § 3404, the predecessor statute to 38 U.S.C. § 5904. Section 3404 imposed criminal penalties on an attorney who charged a veteran fees of more than $10 with respect to any one claim for monetary benefits. The Court held that this limitation did not violate due process, generally deferring to Congress' goals of "wanting the veteran to get the

entirety of the award" and wanting to avoid administrative burdens that would arise if "claimants were permitted to retain compensated attorneys." Walters, 473 U.S. at 326. Section 3404 and the Supreme Court's ruling in Walters were consistent with the structure of the veterans benefits' system at the time, which among other things afforded no judicial review for a denial of benefits. But since the time when Walters was decided, Congress has significantly altered the playing field. In 1988, the Veterans' Judicial Review Act created the U.S. Court of Veterans Appeals, now called the U.S. Court of Appeals for Veterans Claims, which hears appeals from veterans who are dissatisfied with DVA's decisions. Veterans' Judicial Review Act, Pub. L. No. 100-687, 102 Stat. 4105 (1988). In the same act, Congress allowed attorneys to represent veterans at the CAVC. And in 2006, Congress removed the bar to legal representation before the DVA. Veterans Benefits, Health Care, and Information Technology Act, Pub. L. No. 109-461, § 101(c)(1)(A), 120 Stat. 3403, 3407 (2006) (codified at 38 U.S.C. § 5904(c)(1)). Now, attorneys may represent veterans any time after they file their notice of disagreement. See id. Thus, although the Supreme Court appropriately deferred to Congress' judgment in 1985, Congress' judgment has changed.

For better or worse, we have noted the increasingly adversarial nature of the veterans' benefits system—the legal landscape has changed since Walters was decided. In Forshey, we held that our scope of review of the Veterans Court is narrow and that prudential concerns "severely limit the exercise of our authority to consider issues not raised or decided below." 284 F.3d at 1338. The dissent lamented this outcome, arguing that just as in the social security context, a "judicially-imposed requirement of issue exhaustion is inappropriate . . . because the parties have a

nonadversarial relationship." Id. at 1360 (Mayer, C.J., dissenting) (citing Sims v. Apfel, 530 U.S. 103, 108-10 (2000)).  We noted that although proceedings before DVA are still non-adversarial, "under the 1988 legislation the system has changed from a nonadversarial, ex parte, paternalistic system for adjudicating veterans' claims, to one in which veterans . . . must satisfy formal legal requirements, often without the benefit of legal counsel, before they are entitled to administrative and judicial review." Id. at 1355 (quoting Bailey v. West, 160 F.3d 1360, 1365 (Fed Cir. 1998) (en banc)).  Congress could have chosen the path that the Forshey dissent urged, to "revisit its legislative handiwork and restore the veterans' system to its original purpose set out by President Lincoln." Id. at 1365.  But instead, in 2006, Congress opened the doors of DVA to lawyers.  If the Supreme Court was correct in its analysis in Walters, this development adds complexity to DVA proceedings.  Recognizing a due process right to interrogatories is consonant with this "progress" because as veterans face more procedural hurdles, they need more tools to mitigate the risk that their claims for benefits will be wrongly denied.[2]

In Walters, the Court was not impressed with the prospects for legal representation to reduce the risk of an incorrect determination of benefits. See 473 U.S. at 327-34.  Notwithstanding the Court's reasoning, Congress decided to allow this

---

[2]  Although Congress did not provide veterans a right to interrogatories in 1988, see Concurring Op. at 10, this single omission does not have any special significance among the unknown compromises that were made prior to enactment, see Buttrey Stores, Inc. v. United States, 375 F.2d 799, 802-03 (Ct. Cl. 1967) ("To attempt to divine, therefore, just what meaning the omission of the subsection of the bill has is to engage in a fruitless task.").  Further, placing too much weight on general statements in the 1988 legislative history that the process should remain informal ignores the fact that eighteen years later, Congress shifted course and decided that veterans would be better off with legal representation before DVA.

representation. Moreover, although "counsel is not required in various proceedings that do not approximate trials, but instead are more informal and nonadversary," id. at 334, interrogatories do not necessarily run counter to an informal and non-adversarial system. Rather, they would serve to help DVA get to the truth of central factual questions, for example, whether a medical condition is service-connected. See Taylor v. Ill., 484 U.S. 400, 411-12 (1988) ("Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony."). Furthermore, it is not clear why a modest number of uncomplicated interrogatories could not be administered in an informal manner by DVA. After all, DVA could not argue that its own statute and regulation affording it the power to issue subpoenas to compel the attendance of witnesses runs contrary to the informal character of benefits claims proceedings, see 38 U.S.C. § 5711; 38 C.F.R. § 20.711, and interrogatories are considerably less burdensome than live testimony. The government acknowledges that interrogatories would be less burdensome than live testimony, but argues without evidentiary support that interrogatories, too, would be exceedingly burdensome. Finally, in the legal counsel situation, there were substitute safeguards of due process; there is no such substitute for confrontation of medical opinions. See Walters at 473 U.S. at 333-34 ("[T]he need for counsel is considerably diminished" where the veteran received "substitute safeguards such as a competent representative, a decision-maker whose duty it is to aid the claimant, and significant concessions with respect to the claimant's burden of proof."). DVA's duty to assist and the veteran's low burden of proof will not help the veteran at all if DVA has sought and relied upon a superficially convincing but ultimately inadequate medical opinion; this

type of judgment is virtually impervious to review. Just the possibility of interrogatories will motivate DVA to examine medical opinions more thoroughly.

C.

The fact that the judgments are medical in nature only further reinforces the need for confrontation. See Concurring Op. at 18-20 ("Another factor that supports the conclusion that due process does not require a right to serve interrogatories on medical experts has to do with the subject matter: medical judgments."). Although the critical evidence is usually medical, the ultimate judgment within DVA (made by the Board of Veterans Appeals) is made by an administrative law judge using legal standards. See Nieves-Rodriguez, 22 Vet. App. at 300 ("[T]he Board decides, in the first instance, which of the competing medical opinions or examination reports is more probative of the medical question at issue."). Even at the regional office level, ratings specialists are not permitted to make their own medical judgments—ever since 1991, DVA has been forbidden from making judgments on its own independent medical grounds. See Colvin v. Derwinski, 1 Vet. App. 171, 175 (1991), overruled on other grounds by Hodge, 155 F.3d at 1360. Thus, this decision is quite unlike the decision to commit a child to a state mental health care facility at issue in Parham v. J.R., which is made at the will of the admitting physician. 442 U.S. 584, 587-88 (1979). In Parham, the Supreme Court determined that this procedure did not violate due process, noting that the "mode and procedure of medical diagnostics procedures is not the business of judges. What is best for a child is an individual medical decision that must be left of the judgment of physicians in each case." Id. at 608-09. At DVA, Congress has mandated that the decision be left to the will of judges. This is precisely why interrogatories directed to

medical opinions are important—to tell a non-physician administrative law judge when the medical evidence is flawed and should be supplemented or discredited. See Colvin, 1 Vet. App. at 175 ("If the medical evidence of record is insufficient, or, in the opinion of the BVA, of doubtful weight or credibility, the BVA is always free to supplement the record by seeking an advisory opinion, ordering a medical examination or citing recognized medical treatises in its decisions that clearly support its ultimate conclusions.").

The Veterans Court recently explained in great detail how DVA should analyze medical evidence with reference to the Federal Rules of Evidence. See Nieves-Rodriguez, 22 Vet. App. at 302 ("The Court agrees that [the Federal Rules of Evidence] are important, guiding factors to be used by the Board in evaluating the probative value of medical opinion evidence, and that this Court's review of the Board's evaluation of competing medical opinions will be enhanced by their application."). The Veterans Court emphasized that a thorough analysis of the probity of medical opinions is critical even though "medical professionals offering medical opinions in veterans benefits cases do not typically testify subject to cross-examination." Id. The two inquiries emphasized by the Veterans Court were "whether the medical expert is informed of sufficient facts upon which to base an opinion relevant to the problem at hand" and whether the physician properly applied reliable principles and methods in his analysis. Id. at 302-04. These are the foundations of any expert testimony, and although we should expect that the well-intentioned DVA will police them, the single best way to find the answers to these questions is to ask the doctor. Just a few interrogatories will likely cover the relevant foundational inquiries and address the concerns raised by the Veterans Court.

CONCLUSION

At bottom, the <u>Mathews</u> three-part test is not a rigid one. The Supreme Court's opinion in <u>Walters</u> illustrates a thorough, evidence-based analysis to decide what due process requires. As my colleague correctly notes, Mr. Gambill did not provide evidence that there is a grave risk of error absent a right to submit interrogatories to physicians offering medical opinions. <u>See</u> Concurring Op. at 12. Had we reached the issue, this would have hindered Mr. Gambill's claim of a violation of due process under the <u>Mathews</u> test. But the evidence is equally scant on the question of government burden, and there is no dispute that the private interest—compensation of disabled veterans—is vital. Regardless, Mr. Gambill raises a very serious question on an issue of fundamental importance to due process, and I cannot agree that we should foreclose these arguments, or the opportunity for future veterans to develop evidence of the risk of error, especially in view of the government's total lack of evidence that interrogatories would create a significant burden. To the contrary, for the reasons discussed, I believe that the submission of a small number of informal interrogatories to doctors by the veteran or administered by DVA would significantly further Congress' goal of swiftly getting benefits into the hands of deserving veterans.